Good morning, your honor. May it please the court. As this court is aware, Roche's new approved it as a new and different drug, allowing for a different treatment regimen for patients with kidney disease. Those patients now do not have the benefit of a treatment that's available elsewhere in the world for one simple reason. That in other countries, Amgen's patents have rightfully expired and in this country, Amgen's patents have been extended so that others cannot compete to the time period if you accept Amgen's arguments. Not till 2004, but to 2015, a 28-year monopoly precluding competition and other drugs for patients. I just begs the question of whether the trial judge was correct. I mean, I'm aware of the consequences here. Yes, your honor. I mean, what's wrong with the decision below? First of all, your honor, we need to look at Judge Young's decision. Judge Young simply stated that the process patents were patently distinct without going through any detailed explanation. And this court needs to consider that question de novo. The fact of the matter is that if you look at the patent and you study those claims, you will see that that host cell in claim 27 has no choice but to do the process in the process of patent. If we were doing that de novo, would we do it with the benefit of taquita or without it? You can do that without the benefit of taquita. I understand that. What happens if you lose? Then, your honor, I believe... You want taquita like gangbusters, right? If this court disagrees with us, we want taquita, of course. But I don't really think that's necessary. You view taquita as a two-way street, right? I do, your honor. I don't believe that there's... And Mr. Day sees it as a one-way street. Yes, your honor. That is to say only the patentee gets the benefit of the additional period of time during which you're looking for art. Yes, that's correct. That only direct examination is allowed. There's no right for anyone else to put evidence. I don't think that can be the law. If one party gets to put in evidence on a point, the other side gets to put in evidence on that point. And you view taquita as an ODP case? And it simply moved the marker date, right? I understand. That's my belief, your honor. But I don't think we need to... Judge Young didn't know that. He couldn't have. He couldn't have. He could not have. I will point out, your honor, that we did try to put in some subsequent evidence under a 102G. I explained that in your letter brief, I believe. Yes, but it was excluded. So... Whatever happened to theory one? It's out of the case? This is the ODP over the strict one? Yes, that's... Theory is gone. That's the... So theories two, three, and four are allowed? Yes, your honor. Yes, we didn't appeal from what we call the law. I double patented. And the question on two is whether or not the trial judge was correct in providing a safe harbor. Under 121, yes. And the same is true under theory four? Theory four has another wrinkle to it, because theory four is whether the process patent was... Fits under 121 as a patent that's filed as a result of... Right, but the trial judge gave it the safe harbor, right? The trial judge gave the product patents the safe harbor. But that shields part of theory four, right? That's right. So the... As to that point, this court needs to decide whether the statute means what it says. Well, if we were going to strip the theory two, and to some extent theory four, strip away the 121 protection... Yes. You're not arguing that this court ought to perform an ODP analysis, right? We ought to send it back to Judge Young? No, your honor. I don't think so, because the Amgen didn't put in an argument on theory four, and that it... That there was no patentable distinction. If the process claim can be compared to the product claim, let's look at the 933 patent. The 933 patent is just the product of the process. It must inherently flow from the process. Similarly, the human EPO must... In the 422, which is human EPO purified from mammalian cells, grown in culture, must flow from the process, because the process is having the cell and letting it do its job. That's why there's double patenting here throughout, because the 008 patent... It just seemed to me, maybe I'm wrong, but it just seemed to me if the court were to decide that 121 doesn't shield anything in this case, because there never was a divisional file, and in every other case, every other case in our entire jurisprudence where a safe harbor has been permitted had a divisional file, maybe a continuation afterward, but there was a divisional. It seemed to me like if 121 goes away, and if in addition we're going to have this new period of information under Takeda, that you're in essence telling us it's not even complete yet. You don't know how much you might be able to dig up, or how much Mr. Day might be able to dig up. It seemed to me that Judge Young wasn't aware of Takeda. It wasn't his fault, but he's the most familiar person in the judicial system with what's going on here. He remanded the case. I agree, Your Honor, if the court feels that further evidence is necessary, but I don't agree because 121 is a statutory provision. If we were to say or tell you we're going to affirm the judgment on theory, then you want... I'm presuming you want to remand. Yes, Your Honor. We did say that in our letter, but I think that what's important here is to understand what the OOA patent claim is. Because once you grasp that, the rest naturally flows. The OOA patent has the specific DNA. It has it put into the factory, the host cell. It says it's put into the host cell so that it can express, so that the factory can work. It's producing, that's what expression is. It says it's going to be glycosylated, and it says... They were going to allow possession of the biological property. So then the question becomes, how can they not... That claim was held to be invalid for lack of enablement, right? The correct sequence, which is in a dependent claim, but it also claimed analog sequences or those sufficiently duplicative. But if you look at the OOA patent, there is a dependent claim of claim seven that says it's the human eposequence. So we know that that claim seven includes the human eposequence, and we know that that human eposequence is put into a host cell, a CHO cell, the workforce cell used every day to make products in this country, used by Genentech to make TPA, used to make interferon. These are prior art. These are prior art. We don't need to cater. These are prior art. And those patents tell us that you take that DNA, and Amgen stated in the OOA patent claims, it allows possession. Now, obviousness and obviousness-type double patenting do not require a guarantee of success. They require a reasonable expectation of success. And when a patent claim says allowing possession of biological, in vivo biological activity, is it not reasonable to expect that the claim says what it says and means it? So yes, we can remand. We can do this yet again. Roche has been off the market for over a year. But we don't need to, because the claim tells you everything you need to know. All the process claims- Don't you have to prevail on both the product and the process claims? I mean, suppose you win on the process claim. We do need to prevail on the process- Suppose 868 and 968 are invalid over the OOA, right? Right. But suppose that the 933 and the 422 are alive, then injunction still lies, right? Yes, and I would like to add that- You've got to climb both hills, right? I would like to discuss the non-infringement issue on the product claims, because I think that's very important also, Your Honor. And you are correct, of course, that the product claims were also found to be infringed. The 422 claim, as Your Honor is aware, was found to be infringed on summary judgment, right? And it was found to be infringed on summary judgment on an erroneous claim construction. Both the 933 and the 422 have process or source limitations to them. And we have the Abbott case now, which again, Your Honor, Judge Young did not have. Judge Young did not have the Abbott case. It's a recent case. But what do we know? If you look at the 933 patent- The Abbott doesn't help you, does it? I think it does. I think it does, Your Honor. Because it tells you that the product of the 933 patent is defined by its process, and it is the result of that process. So when you look for literal infringement, which is the claim here, you must say, can that, the product that's being brought into this country, can that be made by that process? And the answer to that is an emphatic no. Even if you were to accept the scientifically incorrect premise that something like EPO is in there, that EPO light, if you will, Amgen's experts conceded that if you could somehow tear apart the molecule, the EPO left would not be the product of the process. It would be missing a hydrogen, and it would have a different charge. If you can somehow make believe that the EPO is in there, it's not the same EPO made by the process. And a product by process claim must be limited to the product made by the process. Dr. Lodish, Amgen's expert, admitted that it would be, putting aside the pegylation, it would only be 99% the same. That's not literal infringement. I don't want you to spend too much time on this one point. I know you wanted to get into the issue that Judge Clevenger raised, and your time is running. Well, I think that on the 422, because Judge Clevenger did ask me what about the product claims, I think, on the 422 patent, Judge Young did not apply the source limitation in summary judgment by definition, by his opinion. Because if you apply that source limitation, you have to once again say, what's the result? It's human EPO with its three-dimensional structure, with all its hydrogens, with all its parts. And again, for the same reason, it may be 99% there, but it's not there completely. And that is what's required for literal infringement. You have to have it all for literal infringement. In addition, the claim construction on the 422 patent must be wrong. Because Judge Young said that human EPO, for the purposes of the 422 patent, is a protein, nothing wrong with that, having the amino acid sequence of human EPO. Let's stop there. In 1984, at the time of the filing, that was unknown. And the only thing the patent tells us is it's a molecule of 1 to 166. That's what it tells us. So it could be 1 to 166. And then Judge Young continues, and he says, such as the amino acid sequence of urinary EPO. That was unknown in 1984. Ms. Bonami, let me just, I'm sorry to cut you off, but time is fleeting. Let me just ask you two questions. If we were to conclude that the 121 protection doesn't apply, and contrary to your wishes, we were to send it back, what use, if any, would you make of the holding in Takeda in the district court? Well, I think, Your Honor, that what we would like to do is not say that Dr. Lin published his work a year later or something like that, but to say, if you look at the art that was available in 1983, in 1984, this Cho Cell art, that was in existence. Judge Young said, is that, did they, they didn't know it was going to work. I believe that's the wrong standard. But we could then say, people did know it was going to work because look at how people used it following this. It was, people started it here and it continued there. So in a sense, it's a little bit like when people look at non-enablement art. I understand. That's fair enough. I think what you're getting to now is in your letter. The other question I wanted to ask you was, I think you were responding to a question of Judge Clevenger's with respect to the injunction. And I think you started to say, I would. What would you do if the case goes back along the lines I just indicated with respect to the present injunction situation? What would I do? I mean, we're in a very difficult... I was about to say, if it went back, you were going to pursue something about the injunction? Well, I mean, if this court remands, I don't know how the injunction can stand. Because if the court is saying 121 doesn't apply and the court recognizes that the process claims exist and the host cell claims exist, we really need to understand, are we going to be enjoined for another two years until this case comes back on appeal? Only to be then told, yeah, well, you were right. If we were to vacate the permanent injunction, presumably the preliminary injunction is subsumed into the permanent injunction. Yes. So Judge Young, if he wanted to, could consider whether he wanted to preliminarily enjoin once again. And we could come right back up here. Well, it might come back, but it might be a different issue. I mean, if the question was whether or not you say, okay, we've got a brand new ODP analysis on the product claims and on the process claims running through Takeda. Yes, Your Honor. Then you would argue you'd made a substantial, raised a substantial issue of invalidity, and the other side would talk to the judge about how they think they can overcome it, and he'd have to then redial the PI factors. Yes, Your Honor. You are correct in that. And the result is, by the time we get through all that, and we come back up here, and we go down again, and we come back up here. Well, any remand is eating up time, especially if you're enjoined in the meanwhile. Yes, that's right. If you're not enjoined and you're at risk, you can decide whatever you want to do, right? And meanwhile, patients don't have drug, and that's right. But we have been enjoined for quite a long time, and it's not necessary here. And that is my point to you. We didn't do an appeal in this case being clairvoyant that there would be a Takeda case. We did an appeal in this case because the OOA patent is quite definite. You cannot practice the OOA patent without doing the process. Let's, instead of starting again, let's give you full rebuttal time. Let's hear from the other side. Thank you, Your Honor. Rusty Day representing me. And I want to first respond, if I may, to the point that Ms. Benami made about infringement, because I can clear that up very quickly, and we can put it aside, and then we can get to the OTP issues, if that's all right with the Court. The standard that Ms. Benami announced is exactly the standard that Judge Markey criticized in Amstar. She says, let's take a look at PEG-EPO. You can't make PEG-EPO in a cell. Therefore, it doesn't infringe. Judge Markey was confronted with the same argument in Markey, and he said, that argument turns the law of infringement upside, on its head. And the reason it turns it on its head is because it's asking, are all of the features of the accused product found in the claim? That's not the correct analysis. The correct analysis is, are all of the claimed features found in the accused product? That issue was squarely presented to the jury by Judge Young, and the jury found that all of the claim elements were found in the product. And let me just say, Dr. Lodish never said that the EPO in PEG-EPO was 99%. He said it was all there. Roche's arguments were presented to the jury. Roche argued to the jury that the EPO in PEG-EPO was less than the EPO, that the hydrogen was removed, that that somehow changed the jury. The jury rejected all of those arguments as issues of fact. So I think we can get past the infringement arguments here. Let me take up the ODP arguments first. And it seems to me that the panel is first interested in section 121. And so I'm going to go to that. But if you will bear with me, I want to frame the issue. Because the process claims were not protected by section 121 over the 008. And they were addressed in what has been referred to here as series three, without protection of section 121 against the 008 claims. And Judge Young performed the correct analysis. The first thing he did was he compared the claims of the 08 patent to the claims of the process. And he identified the differences. And what he found, and he found, was that the process of the later claim 868 was not inherent in, and was not the natural result of, the cells that are claimed in the 008 patent. And why is that? Because contrary to what Ms. Bonami said here just now, there is no dependent claim from 007, from claim seven of the 008 patent. There is no dependent claim that points out and recites the human EPO DNA. Every claim dependent from claim seven claims a broad genus of DNAs. And those DNAs are defined by claim seven as encoding polypeptides, amino acid sequences, that are sufficiently duplicative of EPO. Then let me ask you a question. And again, you wanted to start in with the process claims. It sort of led me into this net, what I'll call this nettlesome taquita issue. Sure. Let's assume for the moment the panel were to agree with you in terms of what the district court did in the pre-taquita world on the ODP issue with the process claims. Yes. But then we have taquita. Yes. What do we then do on the ODP issue with respect to the process claims now? Well, assuming we agree that Judge Young got it right pre-taquita, what's the effect of taquita? The longstanding precedent in this court is In re Lanque for deciding questions of obviousness type double patenting. And the issue that is framed is would the later claimed subject matter have been obvious over in light of the earlier claim? What analysis do you perform for that? You must use the prior art. And you must ask yourself in light of the prior art and the claim subject matter, would the later claim subject matter have been obvious? That is exactly the analysis that Judge Young performed. Now, taquita is set up. Taquita applies an MPEP provision that applies to a very different claim relationship than the claim relationship that applies here. The claim relationship in taquita was an earlier claim product. So in this case, an earlier claim to, let's say, EPO, recombinant EPO. And then a later claim process of making recombinant EPO. That's not this case. Taquita had the process for the product disclosed in the original patent, but not claimed. But the original patent first had the product. And the original claim was to the product. But disclosed the process. And it disclosed the process. And then 17 years later, taquita came along and tried to claim the process of making that product. And there's a specific MPEP provision dealing with just that situation. And it tells you that one way that the patentee can distinguish the process is to show that there are alternative processes. And the issue in taquita was, well. But the taquita opinion has to be brought to that, because it cites Enrique and other cases that are involved. I'm sorry. The decision in taquita seems broader than just the MPEP, which is what you've correctly described. Because they cite Enrique and another case that deal with a different situation where the process was first and the product was later. Let me illustrate. On this record, and because this issue has come up, this is in the CD version of the appendix. It's not in the paper version of the appendix. But on this record, let me show you the problem that Roche's preferred rule creates. Roche now says that you should construe taquita not to allow evidence about whether there were alternative processes, or it's possible to have alternative, but rather whether there was, it would have been reasonably expected prior to the invention to make the invention. You should look to post-filing evidence. You should look to evidence in the art afterwards. You should look as late as the, and then they go out and state applications. Well, that art, all of that art is informed by the inventor's disclosures. In particular, I wish to point the court to A31790-91, which is in the CD version of the appendix. That is Amgen's disclosure at a conference in October 1984 showing that CHO cells were used to successfully produce in vivo biologically active EPO using Lin's inventions. Now, when you know that as of that date, and if this goes back on remit, the evidence will show even earlier, Lin's, knowledge of Lin's invention was disclosed to the world. Then you have to ask, what's all this subsequent art informed by?  Let me ask you, are you arguing the merits of the issue now, or how, or what would be allowed to come in? I'm arguing why Roche's interpretation of Takeda is wrong. What do you say, if you were the judge, if you were the judge and Ms. Benami was up before you, what would you tell her Takeda allowed her to do on remit? In the context of a patentability decision, where the patent office is trying to decide whether or not to allow claims to a later claim process for a product of manufacture, Takeda allows the patentee to go to the art to show that having made their disclosure of their invention, others benefiting from that invention have found other processes to make that product. And therefore, granting a patent on the inventor's process will not dominate the product, because other processes exist in the art to make that product. And therefore, you're not getting a time-wise extension on the product. You wouldn't want to rely on N. Ray Taylor, N. Ray Katie, because that's the flip, isn't it? I mean, on the face of it, I think you're right. The way you're reading Takeda doesn't read on the theory forwards, and I understand it. But if you understand the background of all those other cases, N. Ray Taylor, N. Ray Katie, you can have a process first and a product later, and still run that type of analysis. The problem in Takeda is, is Takeda extending its dominance of the product by getting a claim on the process? That's the issue. And Takeda shows by evidence that, no, having made our disclosure of the product, others have invented other ways of making the product, giving us a claim on our process does not extend our dominance. I understand you're trying to limit Takeda to those facts. You also contend, I believe, that Takeda is sort of a one-way street. Only the patentee can get the benefits. Assuming you had Takeda not in a situation where it's coming out of the patent office, but it was in litigation, and someone, a would-be infringer, wanted to argue that there were no alternative processes, they're certainly going to be able to do so. Your Honor, if I were a judge, and I had to apply Takeda, if I were charged with that responsibility, then I would hold, in a like situation with Takeda, where Takeda is arguing that post-invention evidence can be used to show that there are other processes, and Takeda was trying to sue me, I would argue, or I would rule in that case, that then the accused infringer could present evidence to show, you know what, there was no other process. Your view is it would be a two-way street, but within the confines of the facts. That's correct. Now, let me, if I may, come back to the process claims, because it's very important to understand that the 008 claims, Claim 7 and all dependent claims, were generic claims. They claimed a broad array of sequences. Moreover, at the time of the invention, and what the record showed, and what Judge Young found, at the time of the invention, those of skill in the art did not believe that you could produce a biologically active EPO in a cell type that did not naturally produce EPO. The reason for that is because the cells, the mammalian cells, have to do a lot more than just make the polypeptide. They then also have to do all kinds of post-translational modifications. They have to build a glycosylation structure around that polypeptide, and that structure has to be a very specific array of very specific carbohydrates. It was known before Lin that changes in the carbohydrate structure of EPO would deprive it of biological activity. And Cho cells, Chinese hamster over cells, do not make EPO, let alone human EPO. The unexpected result was that you could take a cell that does not naturally produce EPO, that is not equipped by nature, at least as far as you know, with the machinery that allows it to make the forms of glycosylation that are required, and still produce a recombinant polypeptide that has that activity. And the patent office understood that was an unexpected result because the examiner said that those of skill in the art at the time would not have expected that you could express a functional form of a heterologous protein in a different cell type. Genentech, Roche's partner, understood that it was unexpected. That's what they told the patent office when they were prosecuting their TPA patents at the same time. It's that unexpected result that Judge Young found justified his finding that Roche had proved by clear and convincing evidence, based on the prior art, that there was a reasonable expectation of success. Now let me just come, if I may, one last point. And I want to bring this back to KSR. And I want to bring it back to O'Farrell. Because in O'Farrell you have a case where it says, well, obvious to try. Ms. Benami will get up and say, well, oh, wait, it at least says it's obvious to try. Look at that claim. Can't you just take that claim and wouldn't you go do that? Isn't that obvious to try? Well, let's go back and read the facts of O'Farrell, because they're very instructive. O'Farrell says that there are two instances where it would not be obvious to try. But look at the facts in O'Farrell, where it found that it was obvious to try. In O'Farrell, what had published prior to the application was the very specific method that O'Farrell was going to practice. That is, the beta-galactosidase gene with a specific restriction site, inserting a heterologous DNA and putting it in an E. coli and getting expression of the desired sequence. He described the method, and then he described an experiment he ran that proved the principle and demonstrated that it would work. Now, that is not what we have here. We don't have the combination of human EPO with a cell type, with a prototype experiment, demonstrating that it would work. And that's why, before Lin made his invention, the facts in this case establish no one, no one had ever expressed a recombinant glycosylated protein in biologically active form. No one. Lin was the first to do it. And that's why this invention wasn't just not obvious, it was pioneering. And that's why the process claims were allowed by the examiner, notwithstanding his 868, and notwithstanding the 868 prosecution, notwithstanding his ODP rejection. That's why the patent office in the interferences found three separately patentable inventions, the product, the process, and the DNA. And that's why Judge Young independently got to the right result. And for all the reasons, excuse me, your honor, for all the reasons that those claims are patentably distinct, the product claims are patentably distinct. So even if section 121 doesn't apply, the holding on the process claims establishes that the product claims are patentably distinct over the OOA claims. And there is no reason for a remand here. Now, I see my time is running out. We're giving you the same extra time as we're giving your opponent. Thank you. I reserve, and the one thing I want to, if I may, the one thing I want to reserve my time is that there is, Roche has not appealed the court's determination that the 349 patent is protected under section 121 from ODP, and Amgen has cross-appealed on the 349 patent. Because Judge Young should have allowed the question of infringement on that patent to go to the jury. He took it away on Jamal, ruling that there was insufficient evidence of infringement, when the evidence that he had in front of him was exactly the same evidence that he had relied upon in TKT to find infringement, and this court affirmed that. Didn't he feel that it was too scattered for the jury to have grasped? No. Just that it wasn't there. No. I'll address that in my rebuttal, if the court will allow me, or I'll take time now to answer your question. What the judge found, or what the evidence presented was, is that Roche had tested their product in their process using an ELISA assay to measure the amount of EPO produced in the cell culture. The claim requires a radioimmunoassay. They're both antibody assays. One uses radioisotopes. The other one doesn't require that, but they're both antibody assays. Dr. Lodish testified at trial that in his 40 years of experience, the results that you would get with an ELISA assay are virtually the same, if not identical, to the results you get with a radioimmunoassay. Amgen used the evidence from Roche's own commercial process to show that measured by ELISA, the results were 15-fold greater than the claim required. That same evidence, ELISA assay results, were cited by Judge Young in the TKT decision as competent evidence to show infringement. And even if they don't satisfy literal infringement, the explanation of that assay given by Judge Young, by Dr. Lodish, more than adequately satisfied the requirements for an equivalence finding, and the case should have gone to the jury. On that record, it was error to take it away from the jury, and this court should remand for a new trial on that, so that Roche can present its defense. Thank you, and I'll... Thank you, Your Honor. Your Honor, if the court could look now or later at Appendix 295, which is the 008 patent claims, the court can see Claim 11, which is dependent on Claim 7, and Claim 12, which is dependent on Claim 11, so they're both dependent on Claim 7. Claim 11 says a genomic DNA sequence according to Claim 7. Genomic means it comes directly from the gene. You didn't change it. It's the full sequence that's in the cell. Claim 12 says the human species, erythropoietin-coding DNA. That is human epo-DNA. So Claim 7 absolutely discloses and includes, and the 008 patent absolutely discloses and includes human species epo-coding DNA. So you do have, contrary to what Mr. Day just told you, you do have the exact human DNA. Not something sufficiently duplicative. It's disclosed. And that DNA has to have, allow possession, allow a polypeptide that's getting expressed, that's being glycosylated, and it allows possession. Only one category, this is a housekeeping question in a sense, but process. Mr. Day said there's no appeal. You're not challenging the 121 protection given to 349 patent? We won on, it never went further because we won on non-infringement. So, I mean, you can't appeal when you win. Okay, fair enough. Obviously, you're right. I got you. And the second point I'd like to make is, Mr. Day said that there is a disclosure in 1984 by Dr. Lin that showed that his epo was in vivo biologically active and that everyone else learned to use CHO cells from that. Dr. Lin did not disclose testing in humans in 1984. No way. So, all Dr. Lin could tell you is what he told you in 1983 in his earlier application, where having done no testing and simply getting the protein, he said, I know it's going to be in vivo biologically active. That's what he said in his patent application. So, here we have a simple situation. How can you say a protein is going to allow possession of in vivo biological activity and come into court and say that that was not a reasonable expectation? How can anyone read that language and say, it doesn't mean I should expect that I'm going to get in vivo biological activity? I would suggest to your honor, it's the plain meaning of the words. Now, Mr. Day said that there's this body of case law about add-ons. And Judge Young did instruct the jury incorrectly on this point because this court should look at chemistry cases, at biotech cases. Mr. Day likes to talk to you about pencils and erasers. If you look at the Welcome case, the TPA case, where someone adds one amino acid, in Mr. Day's analogy, an eraser to a pencil. That's not still a pencil with an eraser in chemistry. In chemistry, it's a new chemical compound. That's what this court's doctrine is. Mr. Day's analogy would be, if I take a pencil and break it, I can still sharpen it. I've got the functional part. It's still a pencil. And that may be true in the mechanical world. But if I take TPA or EPO or something else, and I figure out which part is the binding region, and I only have half the amino acids, and I change them in some way or whatever, I have a variant. And it does not fall as TPA. It's something else. It's an analog. It's a variant. That is the doctrine of the case law in this court. And I suggest the court also look at the KO or KO case. Because this court, the CCPA throughout, has said, if you change an atom in chemistry, you create a new molecule. Judge Young, in his decision early on, says PEG is a sugar. That is wrong. Well, I think your time has pretty much expired. Thank you. Thank you, Your Honor. And Your Honor, I did not, other than Judge Hill's question, I did not address the cross-appeal. All right. Three very brief points. First of all, the- Limited to the cross-appeal, that was the one point she made. Otherwise, our time is up. Okay, Your Honor. Unless the judges have a question on something else. With respect to the cross-appeal, the fact that they were found not to infringe, they also had a claim for, cross-claim for invalidity. And that was rejected. And they didn't appeal that. And that's why that judgment stands. All right, fine. Thank you very much. Case is submitted. Thank you.